UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION



CONNIE GIBSON, on behalf of herself and
others similarly situated,

)
)
)
Plaintiff,                                    )
)                CV 00-BU-0158-S
)
vs.                                           )
)
COUNTRYWIDE HOME LOANS, INC., et al.,         )           **ENTERED**
)           J‾   2000
Defendants.                                   )

## Memorandum Opinion

   This cause comes to be heard on a motion for class certification filed by the
Plaintiff, Connie Gibson ("Gibson"), on March 9, 2000 (Doc. No. 24).  In her motion,
Gibson seeks to have this Court certify two classes: The first class, on whose behalf
Gibson brings claims under the Racketeer Influenced and Corrupt Organizations Act
("RICO"), 18 U.S.C. Pt. I, Ch. 96, § 1961, *et seq.*, includes all persons with a Countrywide
mortgage who either had excessive flood insurance placed on their property by
Countrywide or purchased flood insurance in an excessive amount to avoid having flood
insurance placed on their property, at any time from 1993 to August 1998.  See Plaintiff's
Reply Brief in Support of Her Motion for Class Certification at 28.  The second class (the

*96*

"contract class"), on whose behalf Gibson seeks to bring claims under the contract laws of the various states, is a subset of the first, or RICO, class, and consists of those individuals in the RICO class who obtained loans under the Fair Housing Act.  The Defendants, Countrywide Home Loans, Inc. ("Countrywide") and Southwest Business Corporation ("Southwest"), contend that neither the proposed RICO class nor the proposed contract class can satisfy the criteria for class certification set forth in Federal Rule of Civil Procedure 23.  On July 13, 2000, Gibson filed a motion for leave to amend her complaint pursuant to Federal Rule of Civil Procedure 15 (Doc. No. 87).  In her proposed amended complaint, Gibson seeks to eliminate all claims against Certain Underwriters of Lloyd's, London, her conversion claim stated in Count VI of her earlier complaint, the claims based upon the duplicate premiums charged against her escrow account, and (most importantly for purposes of this class certification motion) her claims based upon the Defendants' assertions that Gibson's home lay in a special flood hazard area and that she was required to obtain flood insurance.  This motion to amend the complaint will be GRANTED, with the caveat that claims already dismissed by the Court on the theories previously presented to the Court cannot be resurrected in the amended complaint.

In *Culpepper v. Inland Mortgage*, 189 F.R.D. 668, 670 (N.D. Ala. 1999), this Court discussed the background principles governing the determination of class certification expressed in prior caselaw:

> The class-action device was designed as "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700-701, 99 S.Ct. 2545, 61 L.Ed.2d 176[ ].  Class relief is "peculiarly appropriate" when the "issues involved are common to the class as a whole" and when they "turn on questions of law applicable in the same manner to each member of the class." *Id.*, at 701, 99 S.Ct. 2545[ ].  For in such cases, "the class-action device saves the

> resources of both the courts and the parties by permitting an issue
> potentially affecting every [class member] to be litigated in an
> economical fashion under Rule 23." *Ibid.*

*General Telephone Company of the Southwest v. Falcon*, 457 U.S. 147, 155, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). A district court is to make the determination of whether an action should proceed as a class action "[a]s soon as practicable after the commencement of an action brought as a class action. . . ." Fed.R.Civ.P. 23(c)(1). See *American Pipe & Const. Co. v. Utah*, 414 U.S. 538, 547, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), *reh'g denied*, 415 U.S. 952, 94 S.Ct. 1477, 39 L.Ed.2d 568. "The decision to certify is within the broad discretion of the court, but that discretion must be exercised within the framework of rule 23." *Castano v. American Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996).

"A class action may be maintained only when it satisfies all the requirements of Fed. R. Civ. P. 23(a) and at least one of the alternative requirements of Rule 23(b)." *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11th Cir. 1997) (footnote omitted). See also *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1279 (11th Cir. 2000) (same). "Rule 23(a) provides that a class may be certified if the following requirements are met: (1) numerosity: the class is not so numerous that joinder of all members is impracticable; (2) commonality: questions of law or fact are common to the class; (3) typicality: the representatives of the class present claims or defenses that are typical of the class; and (4) adequacy: the representatives of the class will fairly and adequately protect the interests of the class." *Id.* Here, Gibson seeks to have both the RICO class and the contract class certified as "common question" class actions pursuant to Federal Rule of Civil Procedure 23(b)(3). As such, in addition to the Rule 23(a) requirements, she must demonstrate, with respect to each class, "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." FED. R. CIV. P. 23(b)(3). See *Rutstein v. Avis Rent-A-Car Systems, Inc.*, — F.3d —, 2000 WL 569948 at *3 (11th Cir. 2000). In meeting each of the requirements, the

burden of proof rests with the plaintiff "to establish the propriety of class certification."
*Id.*[1]

## Background

Because an understanding of the National Flood Insurance Reform Act of 1994 (the
"1994 Act" or "Reform Act") is essential to any evaluation of Gibson's putative class
claims, the Court will first detail the 1994 Reform Act's history and relevant provisions.
"Congress enacted the National Flood Insurance Act of 1968 [the "1968 Act"] in response
to a growing concern that the private insurance industry was unable to offer reasonably
priced flood insurance on a national basis." *Flick v. Liberty Mut. Fire Ins. Co.*, 205 F.3d
386, 388 (9th Cir. 2000).[2] The 1968 Act established the National Flood Insurance Program

---

[1] The Court further notes that, throughout its opinion, it will narrow the scope of the
proposed class in an effort to render it more stable for purposes of certification pursuant to
Federal Rule of Civil Procedure 23(c)(4)(B).

[2] The 1968 Act was passed consequent to Congressional attempts to control flooding
problems through structural means, such as the building of dams, levees and water reservoirs,
employed to keep the nation's streams and rivers in check, and undertaken "with the confidence
of engineers and the budget of a military campaign." Oliver Houck, *Rising Water: The National
Flood Insurance Program and Louisiana*, 60 TUL. L. REV. 61, 64 (1985). See Bryant J. Spann, *Going
Down for the Third Time: Senator Kerry's Reform Bill Could Save the Drowning National Flood
Insurance Program*, 28 GA. L. REV. 593, 595-96 (1994).

> The United States government's first efforts to deter damage due to
> flooding, beginning in 1927, focused on the physical restraint of floodwaters. The
> government built levees, floodways, reservoirs and other physical structures, all
> at great expense. These efforts often succeeded only in exacerbating flood damages
> elsewhere while creating a false sense of security in the protected areas that
> encouraged building in the floodplain.  Development typically outpaced
> construction of flood protection, further increasing damages. The government's
> efforts aimed at restraining the floodwaters also destroyed or endangered valuable
> ecosystems.

Charles T. Griffith, *Note: The National Flood Insurance Program: Unattained Purposes, Liability
in Contract, and Takings*, 35 WM. & MARY L. REV. 727, 728-29 (1994) (internal footnotes omitted).

("Program"), "a program with 'large-scale' federal involvement, to provide affordable flood insurance on a national basis and to discourage the construction of new structures in flood prone areas." *Id.* Originally, the Program was administered by the Department of Housing and Urban Development ("HUD"); in 1978, however, HUD delegated management of the program to the Federal Emergency Management Agency ("FEMA"). See Reorganization Plan No. 3 of 1978, §§ 202, 304, 43 Fed.Reg. 41943, 41943-45 (1978).[3]

The goals of Program established by the 1968 Act were "to encourage the adoption by local communities of sound land use practices designed to reduce or avoid damage from flooding, and to encourage the purchase of flood insurance in designated flood hazard areas." *Mid-America National Bank of Chicago v. First Savings and Loan Association of South Holland*, 737 F.2d 638, 640 (7th Cir. 1984). See also *Flick v. Liberty Mut. Fire Ins. Co.*, 205 F.3d at 388 (stating that the purposes of the 1968 Act were "to provide affordable flood insurance on a national basis and to discourage the construction of new structures in flood prone areas"). To further "encourage" flood-prone communities to develop sound land-use policies, Congress, in 1973, passed the Flood Disaster Protect Act (the "1973 Act"), which tied federal financial aid for general construction or acquisition purposes in those flood-prone communities to participation in the Program. 42 U.S.C. § 4106(a).

The general scheme of the Program was described in one 1994 article as follows:

> Although the Act has been amended several times, its basic method of operation has remained the same. First, the Federal Emergency Management Agency (FEMA), through the Federal Insurance Administration (FIA), notifies a

---

It was in response to the failures of these structural methods that a national flood insurance program was proposed — first by President Truman in 1951 — and eventually created seventeen years later by the 1968 Act.

[3] In 1983, Congress amended the 1968 Act to substitute the Director of FEMA for the Secretary of HUD, reflecting this change in administrative control. See Act of Nov. 30, 1983, Pub.L. No. 98-181, § 451(d), 97 Stat. 1153.

community that all or part of it is flood-prone. The community must complete an application process that involves enacting basic building codes requiring that all structures built in the flood-prone area be elevated above or made floodproof to Base Flood Elevation (BFE). Once the community has enacted the building codes and FEMA has approved them, the community enters the Emergency Phase of the program, during which residents may receive subsidized rate flood insurance coverage of up to $35,000 for their homes and personal property. These subsidized rate policies, however, are not based on the structure's risk of flooding.

Once a community has entered the Emergency Phase of the program, FEMA performs a detailed study of the area and produces a Flood Insurance Rate Map (FIRM). The rate map identifies what insurance rate should apply to any given area of the community. After the community amends its provisional building codes to conform to the FIRM, its residents are eligible for flood insurance based on actuarial risks. Structures that existed before the community entered the regular program still pay the subsidized policy rates, but all new or substantially improved properties pay risk-based rates.

Bryant J. Spann, *Going Down for the Third Time: Senator Kerry's Reform Bill Could Save the Drowning National Flood Insurance Program*, 28 GA. L. REV. at 597-98 (footnotes omitted).

In drafting a FIRM, FEMA is required to designate certain areas as "special flood hazard areas," floodplain areas in which a one percent or greater chance of flooding in any given year exists. See *Carneiro De Culna v. Standard Fire Insurance Co./AETNA Flood Insurance Program*, 129 F.3d 581, 585 (11th Cir. 1997) and *Woodhill Corporation v. Federal Emergency Management Agency*, 168 F.3d 1025, 1026 (7th Cir. 1999). Under the 1968 Act (as amended by the 1973 Act), a federal agency can not extend financial assistance to a landowner seeking to acquire or build on land within a special flood hazard area unless that landowner obtains flood insurance on the property. 42 U.S.C. § 4012a(a). Congress's purposes in enacting this provision of the Reform Act were to deter individuals who could not afford flood insurance from building in floodplains and to provide adequate funding to the Program to pay out claims on the occasion of flood damage; however,

these purposes were frustrated in practice.  Federally regulated institutions were lax in requiring homeowners to obtain flood insurance before extending loans and they failed to make certain that those homeowners who did obtain flood insurance at the time of loan origination kept that insurance current.  See Spann, *Going Down for the Third Time*, 28 GA. L. REV. at 600-01 and Robert M Jaworski, *The New Flood Regulations*, 114 BANKING L. J. 235, 235 (1997).  This failure was spotlighted by the Midwestern flood of 1993, when the Mississippi River overflowed its banks, causing over $15 billion in property damage in overdeveloped floodplains.  By one estimate, in the areas affected, Illinois, with highest participation in the Program of an affected State, had a mere 8.7% of qualified households within that State participating.  See Spann, *Going Down for the Third Time*, 28 GA. L. REV. at 600-01.

In response, on September 23, 1994, Congress passed the 1994 Act as Title V of the Riegle Community Development and Regulatory Improvement Act.  The Reform Act altered and amended the 1968 Act in several significant ways, including requiring financial institutions and loan servicers to provide notice to borrowers with properties in special flood hazard areas of their obligation to acquire flood insurance within a given time frame and requiring FEMA to update its FIRMs at least once every five years to account for changes to floodplain areas.  Pertinent to this case, Congress, in enacting the Reform Act, attempted to increase the amount of insurance obtained by homeowners living in special flood hazard areas by permitting a lender or loan servicer to place of flood insurance on a borrower's property when that lender or servicer discovers that the borrower is maintaining in a special flood hazard area a building or mobile home in which the lender or loan servicer has a security interest without flood insurance for the property.  42 U.S.C. § 4012a(e).  Under the provision, the lender or loan servicer, upon discovery of a lack of insurance, is first to notify the borrower of the absence of insurance on the property and inform the borrower that she should obtain for the term of the loan "an

amount of flood insurance for the building or mobile home and such personal property that is not less than" the lesser of the outstanding balance or the maximum amount of insurance available through the Program with respect to the particular property — for example, the maximum insurance coverage available for residential property is $250,000.00 for the residential structure and $ 100,000.00 for the structure's contents. 42 U.S.C. § 4012a(e)(1). If the borrower fails to obtain flood insurance within forty-five days of notification, the lender or servicer of the loan "shall purchase the insurance on behalf of the borrower" and is permitted to charge the borrower for the premiums paid and for costs associated with the purchase of the insurance. 42 U.S.C. § 4012a(e)(2). Civil penalties can be assessed by FEMA against a lender who fails to purchase flood insurance for a mortgaged property in a special flood hazard area on which the lender is aware that no flood insurance exists. 42 U.S.C. § 4012a(f).[4]

On May 25, 1994, Gibson purchased a home at 802 Torrey Pine Circle in Birmingham, Alabama, financing her purchase through a mortgage from Countrywide,[5] which provided her with a loan in the amount of $90,189.00. Allegedly, at the time that the loan was extended, it was recognized by all parties to the transaction that while some of the property purchased by Gibson was located within a special flood hazard area, the

---

[4] The regulatory guidelines governing forced placement of flood insurance enacted pursuant to 42 U.S.C. § 4012a(e) are ensconced at several parts of the Code of Federal Regulations, including 12 C.F.R. Pt. 22, 12 C.F.R. Pt. 208, 12 C.F.R. Pt. 339, 12 C.F.R. Pt. 563, 12 C.F.R. Pt. 572, 12 C.F.R. Pt. 614, and 12 C.F.R. Pt. 760.  See 61 Fed. Reg. 45,684 (Aug. 29, 1996).

[5] Countrywide is a mortgage lender that both originates and services loans.

home itself was outside of the special flood hazard area.  Gibson alleges that, as such, she was not required to purchase flood insurance prior to receiving her loan.[6]

The mortgage contract into which Gibson entered states, in relevant part:

**2.   Monthly Payments of Taxes, insurance and Other Charges.** Borrower shall include in each monthly payment, together with the principal and interest as set forth in the note and any late charges, an installment of any (a) taxes and special assessments levied or to be levied against the Property, (b) leasehold payments or ground rents on the Property, and (c) premiums for insurance required by paragraph 4.

* * *

**4.  Fire, Flood and Other Hazard Insurance.**  Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire, for which Lender requires insurance.  This insurance shall be maintained in the amounts and for the periods that Lender requires.  Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary.  All insurance shall be carried with companies approved by Lender.  The insurance  policies and any renewals shall be held by Lender and shall include loss payable clauses in favor of, and in a form acceptable to, Lender.

Exhibit A of Plaintiff's Evidentiary Submission in Support of Motion for Class Certification.[7]   Gibson contends that, at the time of closing, the attorney for

---

[6] See Exhibit B of Plaintiff's Evidentiary Submission in Support of Motion for Class Certification.

[7] The term "Secretary" used in the mortgage refers to the Secretary of the Department of Housing and Urban Development, the entity given charge of the Program until 1983, when FEMA was given by Congress the responsibility of management over the Program.  There are at least two potential conclusions that could be drawn from the employment of the term "Secretary" in the mortgage.  First, the reference to the "Secretary" in the mortgage's flood insurance provisions could be a holdover from the days when the Secretary administered the Program.  On such a reading, it would probably be the case that the mortgage provisions

Countrywide entered into an agreement with her not to require any flood insurance on her property.

As Countrywide puts it, "[i]n response to the [1994 Act] and a directive from the largest owner of the loans which Countrywide serviced, Fannie Mae, Countrywide undertook to audit the flood insurance status of loans in its portfolio." Defendant Countrywide Home Loans, Inc.'s Opposition to Plaintiff's Motion for Class Certification at 16. The goal of the audit was to determine whether and which properties securing loans serviced by Countryside were within a special flood hazard area and required flood insurance. To undertake this audit, Countrywide hired First American Flood Data Services, Inc. ("Flood Data"), to determine what properties and structures were within special flood hazard areas under FIRMs compiled by FEMA. In conducting its investigation, Flood Data determined, contrary to earlier evaluations, that Gibson's home rested within a special flood hazard area. Flood Data then notified Countrywide of its finding regarding the position of Gibson's home.

Countrywide, having been alerted that Gibson's home was located within a special flood hazard area, contacted Southwest, which sent Gibson a notice on March 11, 1997, stating of Flood Data's recent audit that it had located her home within a special flood hazard area and instructing her of her obligation under the Reform Act to procure flood

---

requiring flood insurance "to the extent required by the Secretary" refer to such flood insurance as required by the 1968 Act and the regulations promulgated pursuant thereto. This reading is, however, an unlikely reading of the provision. On a second proposed reading, the term "Secretary" is an up-to-date reference to that amount of flood insurance required by the Secretary under 24 C.F.R. § 203.16a for individuals residing in a special flood hazard area, "an amount at least equal to either the outstanding balance of the mortgage, less estimated land costs, or the maximum amount of the NFIP insurance available with respect to the property improvements, whichever is less." 24 C.F.R. § 203.16a(c). (The Court would briefly draw attention to the fact that the regulation may, in some circumstances, require less flood insurance that the amount required by the Reform Act and may, therefore, be a nullity in the face of the Act.) Countrywide argues the later reading to be the proper one, as the loan secured by Gibson was a Fair Housing Act mortgage, governed by the referenced regulation.

insurance for the property.[8]   The letter informed Gibson that she should contact Countrywide if she had existing flood insurance on her property, noting that such insurance coverage "must at least equal $94,400." Exhibit C of Plaintiff's Evidentiary submission in Support of Motion for Class Certification.[9]   In addition, the letter stated that if she did not maintain insurance on her home, she would have to obtain such insurance or else Countrywide would purchase flood insurance on her behalf and charge her for it.

> If Countrywide does not receive verification of acceptable coverage by 05/14/97, Countrywide will obtain the required insurance on your behalf at your sole cost and expense. In that event, the annual premium of $791.97 plus a $40.00 processing fee charged by the insurance carrier will be paid from your escrow account, and the escrow payment portion of your monthly payment will be increased to reimburse Countrywide.

*Id.* The notice clearly stated that the insurance procured by Countrywide could well cost more than insurance procured by Gibson and that the insurance procured would "only cover the structural dwelling and not personal property or the contents of your home." *Id.* Finally, the notification stated that the coverage obtained by Countrywide could exceed the minimum insurance required by the loan documents. In a document attached to the letter, Countrywide made the following representation concerning the amount of flood insurance Gibson was required to procure:

> The amount of your flood insurance coverage at least must be equal to the lower of (1) *the minimum amount required, under the terms of the coverage, to compensate for any damage or loss on a replacement cost basis* (or the unpaid balance of the mortgage if replacement cost coverage is not available for the

---

[8] Gibson avers that the letter sent to her was a form letter, identical in most respects to letters sent to other borrowers with homes lying in special flood hazard areas.

[9] Countrywide came to the figure of $94,400.00 in flood insurance based upon the value of hazard insurance earlier purchased by Gibson to protect her home from other hazards.

type of dwelling insured); or (2) the maximum limit of coverage made available under the appropriate NFIP.

*Id* (emphasis added).

On March 20, 1997, Gibson responded to the letter by phoning a Countrywide employee and informing the employee that she disputed Countrywide's assertion that her property needed flood insurance, because, she asserted, her home was not in a special flood hazard area. Five days letter, she sent a letter to FEMA requesting a determination that her home did not lie in a special flood hazard area.[10] Gibson did not contest at that time Countrywide's assertion that the amount of insurance she would be required to obtain would need to be at least $94,400.00, the replacement value of the home on her property, not the remaining principle balance of her loan from Countrywide.

Countrywide, through Southwest, sent Gibson another letter on April 14, 1997, reminding her that she was required to obtain flood insurance coverage on her home in at least the amount of $94,400.00 and noting that the principal balance on her mortgage was $88,234.00. In all other respects, the notice provided to Gibson was essentially identical to the one she had earlier received. After receiving this letter, Gibson again contacted Countrywide to dispute its assertion that her home was within a special flood hazard area. Countrywide later responded that it would have Flood Data re-examine the FIRM maps to determine whether she was required to obtain insurance. After checking twice (possibly thrice) more, Flood Data reaffirmed its earlier conclusion that Gibson's home was located within a special flood hazard area.[11]

---

[10] FEMA interpreted the letter as a request to view an earlier special flood hazard determination, than a request to determine her home's status under the existing map.

[11] After this, Countrywide sent Gibson another letter, this time informing her that the minimum amount of coverage that she was required to obtain was $96,600.00. Eventually, Countrywide placed insurance for this amount on her property in addition to other flood insurance, but after recognizing that the coverage was duplicative, rescinded the second policy and refunded in October or November of 1997 the premiums collected.

Because Gibson did not acquire flood insurance of her own initiative, Countrywide placed insurance on Gibson's property.  On June 18, 1997, Countrywide informed Gibson that it had procured flood insurance on her behalf.  This insurance was allegedly obtained by Countrywide from Cetain Underwriters of Lloyd's, London, through Southwest, pursuant to an alleged exclusive agreement with those companies to provide flood insurance.  Gibson avers in her complaint that Countrywide and Southwest agreed to obtain excessive or unnecessary insurance, on which Countrywide would receive commissions and Southwest's excessive premiums.  Regarding Gibson's property, premiums for the policy were paid for by deduction of amounts from her escrow account.

## Contentions & Analysis

Three of Gibson's claims are relevant to the present class certification motion.  The first is Gibson's claim that Countrywide violated section 1962 of RICO by informing Gibson and each putative class member that she or he was required to obtain flood insurance coverage on her or his property in excess of the principle balance on her or his mortgage loan, as well as by improperly placing insurance in excess of the principle balance of each member's mortgage loan if she or he did not obtain flood insurance (the "excessive insurance claim").[12]  The second claim is one for RICO conspiracy against Countrywide and Southwest, claiming that the two entities conspired to improperly place

---

[12] In her proposed fourth amended complaint, Gibson appears to add Southwest to her civil RICO excessive insurance claim, from which it was earlier dismissed.  If Gibson is attempting to expand her theory of the case and provide an additional basis to hold Southwest liable, she should explain her theory more thoroughly by re-filing as more robust Fourth Amended Complaint.  Until then, the Court will continue to treat Countrywide as the sole Defendant in the excessive insurance RICO claim.

flood insurance which covered in excess of the principle balance of each class member's mortgage loan and to create a scheme of kickbacks among them in order that each organization could profit from the collection of excess flood insurance premiums (the "conspiracy claim"). Finally, Gibson seeks certification of the contract class on a claim that Countrywide breached its mortgage contract under the law of each of the fifty states in which it originated mortgages by requiring flood insurance in excess of that permitted under each mortgage agreement (the "breach of contract claim"). The Court will address class certification with respect to each of these claims individually.

I. RICO CLAIM AGAINST COUNTRYWIDE.

As stated previously, Gibson's putative class excessive insurance claim against Countrywide under RICO is simply that Countrywide used the mail to misrepresent to individuals who were required under the Reform Act to purchase flood hazard insurance that they were required to purchase an amount of insurance greater than necessary under the Reform Act, i.e., in excess of the remaining principle balance of their mortgage loans. This is one of two claims for which Gibson seeks certification of the RICO class, the other claim being her conspiracy claim against Countrywide, Southwest, and Lloyd's. For the proposed RICO excessive insurance class to be certified on this claim under Federal Rule of Civil Procedure 23(b)(3), it must be the case (1) that the number of proposed class members who could proceed on such claim are numerous; (2) that in pursuing the RICO excessive insurance claim against Countrywide, the members of the putative class proceed on some material issue of law or fact common to all of them; (3) that Gibson, as a representative of the class, intends to pursue a RICO excessive insurance claim against Countrywide that is typical of the claims of other putative class members against Countrywide; (4) that Gibson is an adequate representative of the interests of the

putative class; (5) that questions to be resolved on an individual or subgroup basis with regard to the putative class members will not predominate over the common questions of law and fact that can be resolved for the entire class; and (6) that the class action device for pursuing the putative class members' claims is superior to other forms of litigation as a means of "fair and efficient adjudication of the controversy." FED. R. CIV. P. 23(b)(3). The Court will address each of these questions in turn with regard to the class defined by Gibson: "all persons with a Countrywide mortgage who either had excessive flood insurance force placed on their property or purchased flood insurance in an excessive amount to avoid having flood insurance placed on their property, at any time from 1993 to the present." Plaintiff's Brief in Support of Her Motion for Class Certification at 5.[13]

---

[13] The Court has, taking the lead from Gibson's arguments in her brief, interpreted "excessive flood insurance" to mean flood insurance in excess of the principle balance of a borrower's mortgage loan. This interpretation is warranted, as other possible interpretations that might be inferred from Gibson's use of the term "excessive" would lead to classes defined in such a manner that the Court clearly could not certify them. First, to take the phrase "excessive flood insurance" at its broad facial meaning of all individuals who had flood insurance greater than that required under some statute, regulation, contract or other standard would be to define the class in such a way that there could be absolutely no commonality, typicality or adequacy among the members of the class consummate with Rule 23(a). On such an interpretation, the viability of each member's claims would be assessed based upon separate facts and by differing legal standards.

Given the briefs filed by Gibson, a reasonable alternative reading of "excessive flood insurance" would be that insurance placed on property in excess of that required under the Reform Act. There are two problems with such a definition. First, it begs the question of who is entitled to be a class member by defining it in terms of those individuals who could prevail in an action against Countrywide for violation of the Reform Act. Second, assuming that such "excessive" insurance would be insurance in excess of the lesser of the remaining principal balance or the replacement value of the residential property up to $ 250,000.00, there are again commonality and typicality problems. The Court would be required to place an artificial septum between those class members for whom the replacement value for their home exceeds the remaining principal balance on their home mortgage loans and those class members for whom the remaining principal balance exceeds the replacement value on their residence. A conflict between the two subclasses is likely because, unless there exists proof that Countrywide had a policy of choosing the higher of the replacement value of a residence and the remaining principal balance of a mortgage loan, of averaging the two amounts, or of something similar, the evidence

Subsequent to filing her motion for class certification, Gibson has modified her class definition to limit it to all persons with a Countrywide mortgage who either had excessive flood insurance force placed on their property or purchased flood insurance in an excessive amount to avoid having flood insurance force placed on their property, at any time from 1993 to August 1998.  Plaintiff's Reply Brief in Support of Motion for Class Certification at 28.

## A. Numerosity.

Gibson asserts that her proposed class is sufficiently numerous to satisfy the requirements of Federal Rule of Civil Procedure 23(a)(1).  According to Gibson, "[f]rom 1995 to 1999, Countrywide borrowers with force-placed flood insurance number[ed] in the thousands, from 720 in 1995 to 3040 in 1999."  Plaintiff's Brief in Support of Her

---

so far points to a policy that Countrywide calculated flood insurance with reference to the replacement value of the residence, not the remaining principal balance on the mortgage loan. Were this so, the "lower replacement value" subclass would seek to debunk such evidence, in clear conflict with the "lower principal balance" subclass, which would seek such evidence being brought to the fore.  Such a conflicted class could not be certified.  See *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000) (stating that "a class cannot be certified when its members have opposing interests or when it consists of members who benefit from the same acts alleged to be harmful to other members of the class"), and *Miles v. Metropolitan Dade County*, 916 F.2d 1528, 1534 (11th Cir. 1990) (noting that "class conflicts may defeat an otherwise proper class").  Further, Gibson would be required to represent these diametrically opposed interests on claims at odds with hers, making her an atypical and inadequate representative for the "lower replacement value" subclass.

A third interpretation of "excessive" flood insurance would be that insurance calculated with reference to the replacement value of structures on the property (or a similar measure). However, such an interpretation may well include everyone who had flood insurance placed upon his or her property and would require the Court to investigate the claims of each class member to determine if the flood insurance placed was actually in excess of the requirements set out by the Reform Act.  The final interpretation, adopted by this Court, is that by "excessive flood insurance" Gibson means the amount of insurance which is in excess of the remaining principal balance on the putative class member's mortgage loan.  At least facially, this interpretation would insure common issues among all class members and presents claims that Gibson seems to share.

Motion for Class Certification at 7. However, the class size is larger than this, avers Gibson, because uncounted are those individuals who purchased flood insurance on their own, rather than have flood insurance placed on their property by Countrywide; Gibson has apparently not attempted any count of the persons who sought and purchased flood insurance on their own or asserted a method by which such persons could be identified.

Under Federal Rule of Civil Procedure 23(a)(1), the class that a plaintiff purports to represent must be "so numerous that joinder of all members is impracticable. . . ." FED. R. CIV. P. 23(a)(1). The numerosity requirement is focused upon the scope of the class defined by the plaintiff and whether the scope of the class definition is appropriate for class treatment. "In order to satisfy his burden with respect to this prerequisite, a plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members." *Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1038 (5th Cir. Unit A 1981). In considering whether the purported class is sufficiently numerous, a district court must consider not only the number of putative class members, but "the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim." *Id.* See also *Kilgo v. Bowman Transportation, Inc.*, 789 F.2d 859, 878 (11th Cir. 1986). It is never simply enough to say that discovery will ferret out the numerous members of the class; it is irrational to require a plaintiff and a defendant to bear the heavy costs of performing an exhaustive search to find class members without any reasoned promise that sufficient numbers of individuals will be found to comprise a numerous class.

While Countrywide apparently does not dispute Gibson's assertion that there exists sufficient numerosity of putative class members to satisfy Rule 23(a)(1) prerequisites,[14] the Court notes that Gibson's contention that the proposed class satisfies

---

[14] The Court does not read Countrywide's argument that Gibson has failed to aver adequate facts to support class certification contained at footnote 90 of its brief in opposition to

the numerosity prerequisite has a significant defect. Gibson has clearly demarcated a group of individuals who had flood insurance involuntarily placed on their property by Countrywide and has presented a manner for the identification of those persons without discovery the costs of which are likely to far overwhelm any benefits — examination of flood insurance policies placed on properties by Countrywide pursuant to the Reform Act; however, Gibson has done little, if anything, to account for or to identify those individuals who sought to obtain flood insurance on their own.

An inability to identify the members of the proposed class because its membership is in fluctuation or may be growing is, by itself, no basis for denying the numerosity of the class; it is, in fact, the opposite, being proof that joinder of all of the parties is impracticable. See, e.g., *Jack v. American Linen Supply Co.*, 498 F.2d 122, 124 (5th Cir. 1974). Here, however, the inability of Gibson to identify those individuals who would make up the subclass of persons who purchased insurance at the urging of Countrywide is conjoined with a failure on her part to provide a reasonable estimate of the subclass's present membership, a basis for estimating their existence, or a methodology by which those individuals may be identified. There is no reasoned approximation of the number of individuals in the subclass, merely the assumptive assertion that a large number of individuals who purchased flood insurance did so because they received a letter informing them of the need to purchase flood insurance in some amount greater than the remaining principal balance of their loans. Nor has Gibson attempted to present a methodology by which such individuals may be identified.[15] While extensive discovery may uncover these

_____

class certification as a specific attack on her ability to demonstrate numerosity, although the argument could conceivably be read into that footnote. Rather, the footnote appears directed at Plaintiff's assertions of commonality and typicality.

[15] The Court notes another weakness in Gibson's assertion of numerosity in that she has put forward no evidence as to the difficulty of joining all of these individuals into a single suit, including the difficulty of finding many members of the class or the absence of personal

individuals, to determine membership, Gibson would be required to contact each individual and determine the amount of insurance he or she obtained or whether he or she was simply continuing insurance earlier purchased. Again, without any reasoned basis to estimate that such a search will turn up numerous persons who were caused to purchase excessive flood insurance on the basis of Countrywide's letters to them, the Court cannot permit Gibson to certify a class then permit her to undertake such an expensive, but potentially fruitless search for class members. Further, the lack of identification cannot be attributed to its indefinite time-span; the period for which Gibson seeks class certification closed in August of 1998. As such, this Court is unable to conclude that Gibson has demonstrated numerosity with respect to the entire class of individuals that she seeks to certify. Rather, she has demonstrated only that a particular subclass of her proposed class is sufficiently numerous: the subclass of those individuals who had flood insurance involuntarily placed on their property by Countrywide in excess of the remaining principal balance on their loans. As to the subclass of individuals who purchased flood insurance in "excessive" amounts based upon representations by

---

jurisdiction such as would make joinder of those class members difficult unless they all made personal appearances in this action.

Countrywide, the Court will decline to certify that portion of the class based on failure to present any evidence as to its numerosity.[16]

## B. Commonality.

In her brief in support of class certification, Gibson asserts that the following commonalities of fact and law exist, permitting certification of the proposed class: First, avers Gibson, each putative class member, including herself, received one or more notice letters from Countrywide misstating the minimum amount of flood insurance that she or he was required to purchase, indicating the minimum amount of coverage required under the Reform Act to be an amount greater than the remaining principal balance of those loans. In addition, Gibson asserts that the notice letters received by the putative class members were identical in their overall form, each stating an amount of insurance that the particular borrower was required to obtain and contrasting that amount with the remaining principal on the loan.

The commonality requirement under Federal Rule of Civil Procedure 23(a)(2) is aimed at determining whether the defined class shares some minimal unity with respect

---

[16] There exists another numerosity issue with regard to the subclass of individuals that had "excessive flood insurance" placed on their properties. Gibson's account of the numerosity of that subclass is based solely on a determination of the number of individuals who had flood insurance placed on their property by Countrywide, without regard to the *amount* of flood insurance placed on the properties. However, Gibson has alleged that on each property on which flood insurance is placed, Countrywide has obtained insurance in excess of the remaining principal balance of the borrower's loan. As such, the set of people with flood insurance placed on their property by Countrywide is purportedly coextensive with the subset of those people whose involuntarily placed flood insurance was for an amount in excess of the remaining principal balance of their mortgage loans. However, Countrywide has averred that it is not the case that every individual who had flood insurance involuntarily placed upon his or her property by Countrywide had such insurance placed in excess of the remaining principal balance on his or her loan, and that for at least 20% of those individuals who had flood insurance involuntarily placed, the amount placed was less than the remaining principal balance on those homes. As such, it may well be the case that the numerosity requirement is not satisfied.

to a particular claim or group of claims presented in the action.  Under Federal Rule of Civil Procedure 23(a)(2), the proposed class representative's burden of demonstrating commonality is a light one; "[a]ll questions of fact and law need not be common to satisfy the rule." *Hanlon v. Chrysler Corporation*, 150 F.3d 1011, 1019 (9th Cir. 1998).  Nor is there any specific "qualitative or qualitative" analysis by means of which commonality may be established. See WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE: CIVIL 2D § 1763, p. 198 (1986).  Different courts have characterized in different ways the minimal degree of commonality of issues and facts among putative class members necessary to satisfy the commonality requirement of Rule 23(a)(2).  At least five circuits have staked out a "minimal" commonality rule, stating that "[t]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class," *Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 56 (3[d] Cir. 1994) (noting also that the commonality requirement is easy to satisfy because only one common issue need be presented to the court), or alternatively, that "[t]he test for commonality is not demanding and is met 'where there is at least one issue, the resolution of which will affect all or a significant number of the putative class members.'" *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999).  See also *Marisol A. By Next Friend Forbes v. Giuliani*, 929 F. Supp. 662, 690 (S.D.N.Y. 1996) (same), *affirmed by Marisol A. v. Giuliani*, 126 F.3d 372 (2[d] Cir. 1997) ("The commonality requirement is met if plaintiffs' grievances share a common question of law or of fact."); *In re American Medical Systems, Inc.*, 75 F.3d 1069, (6th Cir. 1995) ("The commonality test is qualitative rather than quantitative, that is, there need be only a single issue common to all members of the class." (internal quotation removed)); and *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1288 (10th Cir. 1999) (same).  In a similar vein, the Court of Appeals for the Eighth and Ninth Circuits have stated that to satisfy the commonality requirement, "[t]he existence of shared legal issues with divergent factual predicates is sufficient, as is a

common core of salient facts coupled with disparate legal remedies within the class." *Hanlon v. Chrysler Corporation*, 150 F.3d at 1019.  See also *DeBoer v. Mellon Mortgage Co.*, 64 F.3d 1171, (8th Cir. 1995) (stating that the commonality requirement of Rule 23 "is satisfied when the legal question linking the class members is substantially related to the resolution of the litigation" (internal quotations omitted)).  The Seventh Circuit Court of Appeals appears to have raised the bar a bit higher, stating that "[a] common nucleus of operative fact is usually enough to satisfy the commonality requirement of Rule 23(a)(2)."  *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992).  See also *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998) (same).[17]

The Eleventh Circuit Court of Appeals, while noting that "Rule 23 does not require that all the questions of law and fact raised by the dispute be common," *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1557 (11th Cir. 1986), *cert. denied*, 479 U.S. 883 (1986), has not set a baseline from which it may be determined how many and what kind of commonalities are necessary and sufficient to satisfy Rule 23(a)(2).[18]  This Court need not attempt to find that baseline in the current action, since under any existing articulation of the minimum standard of commonality, Gibson has presented material common issues of law and fact concerning the RICO excessive insurance claim.  The following core issues to be resolved are common among the putative class members' RICO excessive insurance claims and encompass some portion of the factual matters

---

[17] Attentiveness to the issue of commonality, even where commonality is apparent, is useful in the context of a motion for class certification pursuant to Rule 23(b)(3), in that the common issues necessary for making the predominance inquiry are isolated.

[18] It seems though that for the commonality requirement to be satisfied, at a minimum, the claim on which class certification is to be granted must be in some way "susceptible to class-wide proof." *Hudson v. Delta Air Lines, Inc.*, 90 F.3d 451, 457 (11th Cir. 1996).  Even in instances where divergent legal remedies are sought by members of the class, commonality will exist among the class where there are elements of proof of each legal claim that are shared and that can be proven generally.

involved in this suit: whether Countrywide employed a policy of representing to borrowers with structures in special flood hazard areas that flood insurance covering greater than the remaining principal balance of their mortgage loans was necessary; whether Countrywide employed a policy of involuntarily placing on each borrower's property insurance covering the replacement value of the structures on the property (or covering some other amount calculated in a manner yielding an amount greater than the remaining principal balance on those class member's loans); and whether the coverage obtained for the class members by Countrywide through its policy resulted in the placement of flood insurance on the class members' properties in excess of the amount it was permitted to place on those properties under the Reform Act. Positive proof resolving these questions can be presented on a class-wide basis and such proof will be decisive on a major issue of the RICO litigation, whether Countrywide misrepresented the amount of insurance that putative class members needed to acquire or have placed on their properties.[19]

There is, however, one minor aspect of the class definition that needs revision to fully meet the commonality prerequisite. Gibson seeks to have a class certified of all individuals who had flood insurance placed on their homes from 1993 until the present in an amount in excess of the remaining principal balance on their loans. However, the Reform Act was not passed until September 23, 1994; there could be no claims of improper involuntary placement arising under the Reform Act prior to that date. Claims of excessive force-placement would have to be tied to other, prior statutes. To show commonality on the varied claims (in addition to the Reform Act based claim) Gibson is

---

[19] As with the numerosity component, Countrywide refuses to explicitly challenge Gibson's assertion that there exists commonality, except on the issue of whether she has put forward adequate facts from which commonality can be shown to exist. The Court is of the opinion that Gibson has put forward adequate facts on this issue and that Countrywide has done little to demonstrate variation from what Gibson asserts was a standard practice of over-calculating the amount of insurance that a borrower was required to obtain.

required to present some suggestion of the theory of these related claims and of what elements these claims share that could be proven on a class-wide basis. Gibson has not, and can not, do this.[20] As such, the commonality prerequisite is satisfied only for that class of individuals in special flood hazard areas who had flood insurance involuntarily placed upon their property by Countrywide after September 23, 1994, in an amount in excess of the remaining principal balance of their mortgage loans.[21]

## C. Typicality.

---

[20] For example, any claim that Countrywide required borrowers in special flood hazard areas to obtain "excessive flood insurance" at the time of purchase in violation of the 1968 Act, 42 U.S.C. § 4012a(a), would be different in kind from the involuntary placement claims at the heart of Gibson's action. To illustrate, no excessive insurance-style claim would lie if it were an existing policy of Countrywide to require borrowers to obtain flood insurance covering the replacement costs of structures on the mortgaged property prior to extension of a mortgage loan. Further, as the extension of the home loan to Gibson clearly was not conditioned on the purchase of flood insurance by her, she would likely be an atypical representative of any subclass of purchasers who were required to obtain flood insurance at the time of loan origination.

Similarly, a claim that Countrywide violated RICO by placing flood insurance on structures not lying in special flood hazard areas would deprive the class of a common claim as, one, there would be no commonality of any element of proof among individuals with claims based on improper placement and those individuals with claims based upon the placement of excessive insurance in violation of 42 U.S.C. § 4012a(e). The legal elements of the claims would also vary between the two groups. There could be no common standard of proof between the groups. Finally, introducing a subclass of individuals who had flood insurance improperly placed on their property into the class would permit the introduction of a group into the class whose parameters would be defined by those whose homes lie outside of flood hazard areas but who were required to obtain flood insurance; a monumental task which would involve the parties and this Court sifting through every FIRM in the nation to determine class members who would automatically prevail on their claims.

[21] There exists also a statute of limitations problem with the class definition, but presumably, given the character of this case as one in which fraud is alleged, the class members can get around such problem by reference to the rule at that an action for fraudulent misrepresentation does not accrue until the injured party should reasonably have become aware of the misrepresentation. See, e.g., *Diaz v. United States*, 165 F.3d 1337, 1339 (11th Cir. 1999).

Gibson asserts that her RICO excessive insurance claim against Countrywide is typical of the RICO claims against Countrywide brought by her on behalf of the putative class. She asserts that, like other putative class members, she was misinformed by Countrywide of the minimum amount of insurance coverage that was required on her property and that, like other members of the putative class, Countrywide placed flood insurance on her property in an amount greater than the remaining principal balance on her mortgage loan. Countrywide first responds that Gibson's RICO claim is atypical of the RICO claims sought to be presented on behalf of the class because Gibson also presents a RICO claim based upon an argument that her home is not located in a special flood hazard area and Countrywide's representations that she is required to have flood insurance covering her property were false.[22]

Second, Countrywide contends that Gibson is atypical in that she conceives that her flood insurance was excessive because it covered the value of the structures on her property, rather than the principal balance of her loan, and that her conception of excessive flood insurance is excessive is likely to vary from what other individual class members would find excessive.[23] Third, Countrywide asserts that Gibson's claim lacks typicality in that she was double-billed by Countrywide for flood insurance (a matter later rectified).[24]

---

[22] For reasons explained more fully in the text of the opinion, the Court will treat this issue as one of adequacy rather than typicality, as Countrywide's argument is not that Gibson's excessive insurance claim in common with other class members is atypical, but that her other claims would place her at odds with the class members on the RICO excessive insurance claim.

[23] This argument is redundant of a more robust predominance argument raised by Countrywide. However, the Court need not address it, as it concludes that Gibson has failed to meet the requirements of Federal Rule of Civil Procedure 23(a).

[24] Countrywide also asserts that Gibson's claim under RICO was not typical of those of that portion of the class who voluntarily purchased flood insurance and did not have flood insurance fore-placed on their property because Countrywide force-placed the insurance on her

Federal Rule of Civil Procedure 23(a)(3) requires that the claims and defenses of the representative parties be "typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). The burden of demonstrating typicality, as with other Rule 23(a) class certification prerequisites, is a generally light one, satisfied if the named plaintiff can demonstrate that "the claims or defenses of the representatives and the members of the class stem from a single event or are based on the same legal or remedial theory," not that she might lose her claim where others would succeed. WRIGHT. MILLER & KANE, FEDERAL PRACTICE & PROCEDURE: CIVIL 2D § 1764, p. 243 (1986). See *Kennedy v. Tallant*, 710 F.2d 711, 717 (11th Cir. 1983). See also *Kreuzfeld v. Carnehammar*, 138 F.R.D. 594, 600 (S.D. Fla. 1991) (stating that "the typicality requirement may be satisfied even if there are factual distinctions between the claims of the named Plaintiff and other class members"). The typicality and commonality analysis are recognized to be close kin and are often treated together in the determination of class certification. See *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157 n.8 (1982) (noting that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge," as "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence") and *Hudson v. Delta Air Lines, Inc.*, 90 F.3d 451, 456 (11th Cir.

---

property. While the difference between those individuals who purchased insurance themselves and those who had it force-placed on their property may be a difference without a distinction, in that members of either subclass either actively or passively had insurance placed on their property in an allegedly excessive amount, the Court has determined, elsewhere in its opinion, that the subclass of individuals who purchased insurance themselves cannot be certified because no factual basis for determining numerosity exists. See *infra* at text located prior to footnote 10.

Finally, Countrywide asserts that because circumstances regarding liability vary widely among individual putative class members, there exists no typicality between Gibson and the class she seeks to represent. This, however, is primarily an issue of whether the common questions in this action predominate over matters that vary for individual class members.

1996) (stating that "[a]lthough the issues of commonality and typicality are separate inquiries, proof of each also 'tend[s] to merge,'" quoting *Washington v. Brown & Williamson Tobacco Corp.*, 959 F.3d 1566, 1569 n.8 (11th Cir. 1992)). However, the commonality and typicality inquiries are separate ones, and some degree of analytical clarity can be obtained from holding them apart. See, e.g., *Hudson v. Delta Air Lines*, 90F.3dat 456. While examination of commonality is meant to determine whether the defined class brings a claim or group of claims that are unified, the typicality analysis is meant to uncover whether there exists a detrimental deviance in proof of the common claim or group of claims attributable to the proposed class representative.[25]

The key to the typicality inquiry is whether the named plaintiff, in proving her claim, will advance the common claims of the putative class members. See *Sprague v. General Motors Corporation*, 133 F.3d 388, 399 (6th Cir. 1998) ("The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class."). In making this inquiry into typicality, a district court is to pay heed "to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Jones v. Shalala*, 64 F.3d 510, 513 (9th Cir. 1995). In other words, a district court must determine whether the proof required to establish an element of the named plaintiff's claim would suffice to prove that element for all class members. See *Andrews v. American Telephone & Telegraph Co.*, 95 F.3d 1014, 1022 (11th Cir. 1996), and *Jones v. Takaki*, 38 F.3d 321, 323 (7th Cir. 1994). This can generally be shown if an element of a named plaintiff's claim is to be proven with reference to an "event or practice or course of conduct that gives rise to the claims of other class members

---

[25] This sets forth a distinction between the typicality and adequacy analysis as well, as the typicality analysis is concerned with deviance by the proposed representative from the norm of the common claim or claims that would detract from the prosecution of that claim, while the adequacy analysis often concerns itself with potential conflicts between the proposed representative and class members presented by other claims of the proposed representative.

and his or her claims are based on the same legal theory." *De La Fuente v. Stokley-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983). See also *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984)("A sufficient nexus [between the named plaintiff and the class members] is established if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory."). While under the typicality analysis, all aspects of the claim of the named plaintiff and the putative class members need not be identical, where "the factual position of the representative markedly differs from that of other members of the class," typicality will be considered absent. *Id.*

Countrywide's argument for denial of class certification based on an absence of typicality, that Gibson, unlike other putative class members, was erroneously double-billed for flood insurance, is without substance. That Countrywide billed Gibson twice for flood insurance is not material to her RICO excessive insurance claim against Countrywide, except perhaps insofar as she was allegedly over-billed twice.

## D. Adequacy.

Gibson asserts that she is an adequate representative of the class, as there exists no conflict or antagonism between her interests and those of the class members and as the counsel that she has retained is experienced and capable of handling class litigation. Countrywide disputes Gibson's contention that she is an adequate representative of the class, arguing that her RICO claim against Countrywide based upon the improper placement of any flood insurance on her property (the "improper placement" claim) places her at odds with the putative class members whose only RICO claim is an excessive insurance claim. If, argues Countrywide, her argument that she was not required to obtain flood hazard insurance is viable, the placement of any amount of flood insurance placed upon her property was improper, regardless of any alleged misrepresentation by

Countrywide regarding the amount of such insurance she was required to obtain. Any excessive insurance RICO claim by Gibson against Countrywide would be subsumed by her improper placement claim. If the excessive insurance claim is subsumed, Countrywide argues, the commonalities between Gibson's claim and those claims of the class would evaporate, leaving the class without a representative. Countrywide further contends that, beyond this potential conflict between Gibson and the putative class, Gibson has demonstrated little knowledge of the action and has shown no desire to direct counsel's activities in governance of the class, if one is certified.

Federal Rule of Civil Procedure 23(a)(4) requires that the proposed representative of a putative class "fairly and adequately protect the interests of that class." FED. R. CIV. P. 23(a)(4). See *Pickett v. Iowa Beef Processors*, 209 F.3d at 1280 ("Rule 23(a)(4) requires that parties representing a class fairly and adequately protect the interests of class members."). The purpose of the adequacy requirement is to uncover whether the proposed class representative, for reasons external to deficiencies in the plaintiff's claim in common with those of the class, would be unable to effectively represent the class. "The adequate representation requirement involves questions of whether plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation, and of whether plaintiffs have interests antagonistic to those of the rest of the class." *Griffin v. Carlin*, 755 F.2d 1516, 1533 (11th Cir. 1985). Thus, a court's investigation into adequacy often involves not only an examination of the fitness of a named plaintiff to serve as a representative of the putative class, but the fitness of that representative's preferred counsel as well. While Countrywide challenges both Gibson's adequacy and the adequacy of her counsel, its primary focus is upon Gibson's interest in maintaining an action on behalf of the putative class.

The central aspect of any investigation into the adequacy of the named plaintiff to serve as the representative for a putative class is whether the proposed representative

plaintiff is of "such a character as to assure vigorous prosecution or defense of the action so that members' rights are certain to be protected." WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE: CIVIL 2D § 1766, p. 303. "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Achem Products v. Windsor*, 521 U.S. 591, 625 (1997). These conflicts can come in a variety of guises, shading from outright conflicts between the named plaintiff and the class members based upon conflicts among the presented claims to more invidious conflicts involving the unwillingness of the named plaintiff to vigorously pursue an action on the behalf of others.

Countrywide's claims of conflict are all birthed of Gibson's alternative improper placement claim for relief under RICO — i.e., that Countrywide's assertions that Gibson's home was located within a special flood hazard area were fraudulent misrepresentations resulting in the wrongful placement of any insurance on her home. According to Countrywide, not only is it the case that Gibson will cease to be a viable representative of the putative class were she successfully to prosecute her claim related to the improper placement of flood insurance on her property, Gibson's primary focus is on proving that Countrywide improperly placed insurance on her property rather than on proving that Countrywide placed an excessive amount of insurance on her property. Countrywide's primary argument for denying class certification on the basis of an absence of adequacy is that Gibson, by bringing the improper placement RICO claim, has presented a claim that would put her in conflict with the RICO class on the excessive flood insurance RICO claim. The Court agrees that, if Gibson continued to maintain an improper placement claim against Countrywide, she would be inadequate to pursue relief on behalf of the putative class for the reason that were Gibson to prevail on her improper placement

RICO claim, she would lose RICO standing to pursue her excessive insurance claim.[26] However, Gibson has, in her amended complaint, eliminated all improper placement claims from this action. As such, Countrywide's challenge to Gibson's adequacy to serve as class representative is unsupported. Further, the Court finds, the experience of Gibson's counsel adequately protects the interests of the class in this case.

## E. Predominance.

The majority of the briefs by both parties focuses on the predominance requirement of Federal Rule of Civil Procedure 23(b)(3). Gibson claims that because the focus of the instant action will be on Countrywide's policies and actions, rather than on the behavior of the individual class members, the common issues in the present action will not predominate over any matters particular to the individual class members.

---

[26] In *Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Florida, Inc.*, 140 F.3d 898, 906 (11th Cir. 1998), the Eleventh Circuit Court of Appeals reiterated the principle that a plaintiff may only bring an action under RICO if that plaintiff has "RICO standing." To have RICO standing, the Court of Appeals stated, a plaintiff must demonstrate that her or his injuries are "the direct result of the alleged racketeering activity." *Id.* Further, such injury must be to the plaintiff's business or property; a personal injury arising from a violation of RICO is insufficient to grant the plaintiff standing under RICO. See *Grogan v. Platt*, 835 F.2d 844, 847 (11th Cir. 1988), *cert. denied*, 488 U.S. 981 (1988). Were Gibson to succeed on her RICO improper placement claim against Countrywide, all of her injuries, including her injuries related to the "excessive" premiums, would stem from that claim; the only remaining injuries that could form the basis of her excessive insurance claim would be for pain and suffering or emotional loss. However, "to the extent that the plaintiffs claim that the emotional and mental distress suffered by the harassment caused them an 'injur[y] in [their] business or property,' this claim is unavailing." *Pilkington v. United Airlines*, 112 F.3d 1532, 1536 (11th Cir. 1997). Thus, if her improper placement claim were successful, Gibson would lack an injury capable of providing her standing under RICO.

Further, the deposition testimony offered by Gibson and the briefs filed by Gibson in support of the motion for class certification clearly indicate that, prior to dismissing her improper placement claims against Countrywide, she was as equally, if not more, focused on having her home adjudicated not to lie in a special flood hazard area as she was on presenting her excessive flood insurance claim.

Countrywide responds that issues of the reliance of the individual RICO class members will predominate over any common issues in the action and, further, that issues of individual contract interpretation will predominate over the common issues in the present action.

Federal Rule of Civil Procedure 23(b)(3) requires that for a "common question" class to be certified, it must be the case that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members. . . ." FED. R. CIV. P. 23(b)(3). With regard to general principals governing the predominance analysis, the Eleventh Circuit Court of Appeals stated, in *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1007 (11th Cir. 1997):

> "In other words, 'the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof.'" *Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1557-58 (11th Cir. 1989) (*quoting Nichols v. Mobile Bd. of Realtors, Inc.*, 675 F.2d 671, 676 (5th Cir. Unit B 1982)). The predominance inquiry focuses on "the legal or factual questions that qualify each class member's case as a genuine controversy," and is "far more demanding" than Rule 23(a)'s commonality requirement. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, —, 117 S.Ct. 2231, 2249-50 (1997).

More specifically, the determination of whether common issues predominate over individualized matters involves an investigation of the degree to which each individual's claims will be advanced by the class-wide proof.

> In order to determine whether common questions predominate, "we are called upon to examine the cause[ ] of action asserted in the complaint on behalf of the putative class." McCarthy v. Kleindienst, 741 F.2d 1406, 1412 (D.C.Cir. 1984). Whether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action. See *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997) ("[The predominance] inquiry trains on the legal or factual questions that qualify each class member's case as a genuine controversy."); *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978) ("[C]lass determination generally involves

considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'") (*quoting Mercantile Nat. Bank v. Langdeau*, 371 U.S. 555, 558 (1963)); *id*. at 469 ("'The more complex determinations required in Rule 23(b)(3) class actions entail even greater entanglement with the merits.'") (quoting 15 C. WRIGHT, A. MILLER, & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3911, p. 485 n. 45 (1976)); *Castano v. American Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996) ("Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues."); *Huff v. N.D. Cass Co.*, 485 F.2d 710, 714 (5th Cir. 1973) (en banc) ("It is inescapable that in some cases there will be overlap between the demands of [Rule] 23(a) and (b) and the question of whether plaintiff can succeed on the merits.").

*Rutstein v. Avis Rent-A-Car Systems, Inc.*, 211 F.3d 1228, 1234 (11th Cir. 2000).

To prove a RICO excessive placement claim, it must be shown (1) that Countrywide intentionally engaged in a scheme to defraud the class members of property or money, (2) that it used the mail or wires in furtherance of the scheme, and (3) that the fraud proximately caused the class members an injury cognizable under RICO. See *Pelletier v. Zweifel*, 921 F.2d 1465, (11th Cir. 1991). "[W]hen the alleged predicate act is mail or wire fraud, the plaintiff must have been a target of the scheme to defraud and must have relied to his detriment on misrepresentations made in furtherance of that scheme." *Id*. at 1500. In its substance, the class claim is that through the mail, Countrywide sent to all of the putative class members notices informing them that they were required to obtain flood insurance for the replacement value of their homes, in excess of the amount required by the Reform Act, and informing them that Countrywide would procure the replacement value insurance for the members if they did not seek such insurance themselves. Because the members did not inform Countrywide that they had procured insurance in the appropriate amount, Countrywide procured insurance for the replacement value of the structures on the properties and charged the members for it. The members of the class relied on Countrywide's representation that replacement value

insurance coverage was required in not seeking lower-value insurance coverage from another institution.

In proving injury from Countrywide's alleged scheme to deceive class members about the amount of insurance they were legally required to obtain, the class members would be required to show that Countrywide was not permitted to require them to obtain insurance in excess of the minimum necessary under the Reform Act. In their letters to borrowers, however, Countrywide states only that the Reform Act requires the borrowers to obtain flood insurance. Countrywide states that it requires flood insurance covering the replacement value of a borrower's home. For each member to demonstrate that Countrywide caused her or him to purchase insurance in excess of that permitted — that is, that she or he was deceived into purchasing insurance in excess of the amount of flood insurance Countrywide had the authority to compel them to obtain — she or he would have to demonstrate not only that the insurance Countrywide compelled her or him to purchase was in excess of the amount permitted by the Reform Act, but that the insurance was in excess of that amount Countrywide was permitted to require under the various mortgage contracts. There is no indication that the mortgage contracts at issue are uniform; further, inquiring into each would raise issues likely to predominate over the common issues in the present action. As such, on the RICO excess insurance claim, class certification will be DENIED.

## II. RICO CONSPIRACY CLAIM AGAINST COUNTRYWIDE AND SOUTHWEST.

For the same reasons that Gibson is incapable of representing the RICO class on an excessive insurance RICO claim against Countrywide, she cannot act as a representative to the RICO class on her conspiracy claim against Countrywide and Southwest. Therefore, as to this claim, class certification will be DENIED.

III. BREACH OF CONTRACT CLAIM AGAINST COUNTRYWIDE.

Gibson seeks to have the Court certify a class of all individuals who had Fair Housing Act loans and who had flood insurance involuntarily placed on their property in an amount in excess of that permitted by their mortgage contracts from 1993 until 1998. According to Gibson, Countrywide's mortgage loan contracts contained identical provisions requiring no more flood insurance than that permitted by the Secretary of HUD, but, in placing insurance on the properties, Countrywide exceeded the amount permitted in the Secretary's regulations — i.e.. "an amount at least equal to either the outstanding balance of the mortgage, less estimated land costs, or the maximum amount of the NFIP insurance available with respect to the property improvements, whichever is less." 24 C.F.R. § 203.16a(c).

The Court will not certify this subclass because Gibson has failed to demonstrate numerosity under Federal Rule of Civil Procedure 23(a). First, Gibson has put forward no proof indicating the compass of her contract class, which is a sub-class of her proposed RICO class. As such, the Court has no basis from which to evaluate the numerosity of the class.

Conclusion

For the foregoing reasons, Gibson's motion for class certification will be DENIED. The motion to amend will be GRANTED, except insofar as Gibson seeks to reintroduce claims earlier dismissed by this Court.

DONE and ORDERED this 25th day of July, 2000.

H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE